J-S43018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| FRANK DONTE BOOKER | |
| Appellant | No. 1544 WDA 2016 |

Appeal from the PCRA Order Dated September 20, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0008090-2012
CP-02-CR-0008338-2012
CP-02-CR-0011318-2013

BEFORE: STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED OCTOBER 12, 2017**

Appellant, Frank Donte Booker, appeals *pro se* from the order dismissing his petition filed pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. We affirm.

On August 22, 2013, a jury convicted Appellant of third-degree murder and related charges. Appellant filed a direct appeal in which he raised two claims challenging the trial court's jury instructions. This Court stated, "[b]oth issues are premised upon [Appellant's] theory of the case that [two individuals] attempted to rob him . . . and that he shot [one of the individuals,] believing that his life was in danger." ***Commonwealth v. Booker***, 134 A.3d 107 (Pa. Super. 2015) (unpublished memorandum),

_____

[*] Former Justice specially assigned to the Superior Court.

***appeal denied***, 131 A.3d 489 (Pa. 2016). Upon review, this Court affirmed Appellant's judgment of sentence based on our determination that Appellant waived the two claims by not objecting when the trial court gave the jury instructions. Appellant filed a petition for allowance of appeal with the Supreme Court. After the Supreme Court denied the petition, Appellant timely filed the underlying PCRA petition *pro se*. ***See*** 42 Pa.C.S. § 9545(b)(3).

The PCRA court appointed counsel to represent Appellant, and on June 17, 2016, Appellant's counsel filed a motion for leave to withdraw and ***Turner***/***Finley*** brief in support of the motion.[1] On July 14, 2016, the PCRA court granted counsel's request to withdraw his appearance and gave notice of its intent to dismiss the PCRA petition. Appellant filed a *pro se* response on September 19, 2016. The PCRA court dismissed Appellant's PCRA petition on September 20, 2016. Appellant filed a timely appeal on October 7, 2016. The PCRA court issued its opinion on February 27, 2017 and the certified record was transmitted to this Court.

On appeal, Appellant presents four issues in which he asserts the ineffectiveness as trial counsel:

1. Did the PCRA court err in rejecting without a hearing [Appellant's] claim that trial counsel was ineffective for failing to lodge a timely and specific objection to the Court's refusal to charge the jury on justification/self-defense?

---

[1] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988); ***Finley v. Pennsylvania***, 550 A.2d 213 (Pa. Super. 1987) (*en banc*).

2. Did the PCRA court err in rejecting without a hearing [Appellant's] claim that trial counsel was ineffective for failing to lodge a timely and specific objection to the Court's refusal to charge the jury on the lesser-included offense of manslaughter?

3. Did the PCRA court err in rejecting without a hearing [Appellant's] claim that trial counsel was ineffective where she failed to provide a full consultation about [Appellant's] right to testify, offered unreasonable advice to Petitioner not to testify, and thereby depriv[ed] [Appellant] of his right to testify and the right to a planned and coherent trial strategy?

4. Did the PCRA court err in rejecting without a hearing [Appellant's] claim that trial counsel was ineffective for failing to present Dr. Alice Applegate, Ph.D., an expert in forensic psychology, as a witness to support the "unreasonable belief" facet of the defense?

Appellant's Brief at 7.

Our standard of review is well-settled:

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Further, where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

There is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no

genuine issues of material fact exist, then a hearing is not necessary. *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008) (citation omitted), *appeal denied*, 956 A.2d 433 (Pa. 2008). However, a reviewing court must examine the issues raised in the PCRA petition in light of the record in order to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and in denying relief without an evidentiary hearing. *Commonwealth v. Springer*, 961 A.2d 1262, 1264 (Pa. Super. 2008) (citation omitted).

In all of his issues, Appellant claims his trial counsel was ineffective. Our Supreme Court has stated:

> Counsel is presumed effective, and the petitioner bears the burden of proving otherwise. *Commonwealth v. Roney*, 622 Pa. 1, 79 A.3d 595, 604 (2013). To prevail on an ineffectiveness claim, the petitioner must plead and prove, by a preponderance of the evidence, the Sixth Amendment performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This Court has divided the performance component of *Strickland* into two sub-parts dealing with arguable merit and reasonable strategy. *Commonwealth v. Baumhammers*, . . . 92 A.3d 708, 719 ([Pa.] 2014). Thus, to prevail on an ineffectiveness claim, the petitioner must show: that the underlying legal claim has arguable merit; that counsel had no reasonable basis for his or her action or omission; and that the petitioner suffered prejudice as a result. *Id.* (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975–76 (1987)).

*Commonwealth v. Bardo*, 105 A.3d 678, 684 (Pa. 2014). In other words, to satisfy his burden, Appellant must plead and prove by a preponderance of the evidence that: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some

- 4 -

reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different." ***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). Failure to satisfy any prong of this test will result in rejection of the petitioner's ineffective assistance of counsel claim. ***Commonwealth v. Jones***, 811 A.2d 994, 1002 (Pa. 2002). Therefore, if a petitioner fails to prove by a preponderance of the evidence any of the prongs, the court need not address the remaining prongs. ***Commonwealth v. Fitzgerald***, 979 A.2d 908, 911 (Pa. Super. 2009), ***appeal denied***, 990 A.2d 727 (Pa. 2010). Where the underlying claim is meritless, "the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit." ***Commonwealth v. Spotz***, 47 A.3d 63, 122 (Pa. 2012). Further, "counsel cannot be considered ineffective for failing to pursue a meritless claim." ***Commonwealth v. Lopez***, 739 A.2d 485, 495 (Pa. 1999), ***cert. denied***, 530 U.S. 1206 (2000).

Consistent with the foregoing, we have reviewed the record and determined that the PCRA court did not err in concluding that Appellant's claims of trial counsel ineffectiveness did not warrant relief. The PCRA court's reasoning is supported by the record and free of legal error. The Honorable David R. Cashman, who sat as both the trial and PCRA court, has ably addressed Appellant's four claims, referencing prevailing precedents, as well as the evidence presented at trial. Accordingly, we adopt Judge

Cashman's opinion in affirming the order denying Appellant post-conviction relief. The parties are instructed to attach a copy of Judge Cashman's February 27, 2017 opinion to any relevant future filings.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/12/2017

IN THE FIFTH JUDICIAL DISTRICT OF THE COMMONWEALTH OF
PENNSYLVANIA
COUNTY OF ALLEGHENY

COMMONWEALTH OF PENNSYLVANIA

vs.

FRANK DONTE BOOKER

CRIMINAL DIVISION
CC No. 201208090; 201208338;
201311318
Superior Court No. 1544WDA2016

**OPINION**

JUDGE DAVID R. CASHMAN
308 Courthouse
436 Grant Street
Pittsburgh, PA 15219
(412) 350-3905

Copies Sent To:

Michael Streily, Esquire
  (Interoffice)
Office of the District Attorney
4th Floor, Courthouse
Pittsburgh, PA 15219

Frank D. Booker, #LJ8774
  (US Mail)
SCI Fayette
P.O. Box 9999
LaBelle, PA 15450-0999

ORIGINAL
Criminal Division
Dept. of Court Records
Allegheny County, PA.



FILED
2017 FEB 27 AM 10: 27
DEPT OF COURT RECORDS
CRIMINAL DIVISION PA
ALLEGHENY COUNTY PA

IN THE FIFTH JUDICIAL DISTRICT OF THE COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ALLEGHENY
CRIMINAL DIVISION


COMMONWEALTH OF PENNSYLVANIA)  CC No. 201208090; 201208338
                            )     201311318
         vs.            )  Superior Court No. 1544WDA2016
FRANK DONTE BOOKER      )

## OPINION

On August 22, 2013, following a jury trial, the appellant, Frank Booker, (hereinafter referred to as "Booker"), was found guilty of third degree murder, possession of a firearm without a license and three counts of recklessly endangering another person. Prior to the commencement of that jury trial, the charge of person not to possess a firearm was severed and heard by this Court in a non-jury trial in conjunction with his jury trial. This Court rendered a verdict of guilty with respect to that charge. A presentence report was ordered and on November 26, 2013, Booker was sentenced to a period of incarceration of not less than two hundred twenty-five to four hundred fifty months for his conviction of third degree murder, a consecutive sentence of incarceration of not less than sixty nor more than one hundred twenty months for his conviction of person not to possess a firearm, which sentence of incarceration was to be followed by a period of probation of seven years for his conviction of possession of a firearm without a license and three concurrent periods of probation for his convictions on the charges of recklessly endangering another person. Booker filed a timely appeal with the

2

Superior Court and that Court, on October 26, 2015, affirmed his judgment of sentence.

On February 8, 2016, the Supreme Court denied his request for an allowance of appeal. On March 11, 2016, Booker filed a pro se petition for post-conviction relief and Charles Pass, Esquire, was appointed to represent him in connection with that petition. On June 17, 2016, Pass filed a *Turner/Finley* letter indicating that the claims sought to be raised by Booker were without merit. This Court sent Booker a notice of intention to dismiss his petition for post-conviction relief on July 13, 2016. Booker filed a response to the notice of intention to dismiss on August 2, 2016 and after reviewing the assertions set forth in that response, this Court denied his petition without a hearing a on September 19, 2016. Booker then filed a timely appeal to the Superior Court and was directed pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) to file a concise statement of matters complained of on appeal. In complying with that directive on December 20, 2016, Booker raised four claims of error. Initially Booker maintains that this Court erred in dismissing his petition without a hearing as he believed that his trial counsel was ineffective for failing to lodge a timely objection to this Court's refusal to charge the jury on the defense of justification. Booker next maintains that his trial counsel was ineffective for failing to object to this Court's refusal to charge on the lesser included offense of manslaughter. Booker further maintains that his trial counsel was

3

ineffective in provide a full consultation with him with respect to his right to testify. And, finally, Booker maintains that his trial counsel was ineffective in failing to present the testimony of Dr. Alice Applegate as a witness in support of the unjustifiable belief that the use of deadly force was necessary with respect to his claim of the defense of justification.

The facts of Booker's case were set forth in this Court's original Opinion in connection with his direct appeal to the Superior Court as follows:

On May 11, 2012, the victim, Calvonne Rollins, (hereinafter referred to as "Rollins"), picked up his girlfriend, Tamira Scheuermann, at work and drove to the Get Go gas station located in Penn Hills where they were to meet some other people. Rollins was driving and Scheuermann was the front seat passenger and the one-year-old son that she had with Rollins was in a car seat in the middle of the back seat. At the Get Go station they met up with James Ingram whom they knew and Frank Booker, whom they had never met before. Ingram asked Rollins to give him a ride back to his house so that he could get his phone charger and he got into Rollins' vehicle. Since they did not know Booker, they left him at the Get Go gas station.

Rollins drove Ingram to his house and they agreed to meet a little while later so all of them could smoke some marijuana. Later that day they met up with Gerald Brown and they smoked the marijuana. Rollins decided to go back to the Get Go station and was traveling along Coal Hollow Road when they ran into Ingram who was leaving his girlfriend's house who asked them to give Booker a ride and he would pay for it. They met up with Booker a short time later and he agreed to pay for the ride to go to Blackadore Street. Booker was seated directly behind Rollins in the left rear passenger seat. When they approached the intersection of Blackadore and Ravina, Rollins stopped the car. Scheuermann, who was on the phone, thought that Booker was going to pay Rollins for the jitney ride since he was fiddling with something inside of his hoodie. Booker then pulled a silver gun and put it to Rollins' head and told him to "give it up". When Brown saw the gun, he opened the right rear passenger door and ran from the car. Rollins attempted to swat the gun away from Booker and Scheuermann grabbed his wrist in an effort to get it away from

4

Booker. Rollins then attempted to push Booker toward the open right rear door when Booker started to fire anywhere between five and six shots at Rollins. Booker then fled from the scene. The Escalade started to drift back down Blackadore until it hit another car and came to rest. Rollins then opened the driver's door and rolled out of the car and was lying on the ground. Scheuermann called 911 and requested the police and paramedics who arrived within ten minutes of that call. It is obvious that Rollins was in critical condition as a result of the life-threatening wounds that he received. When he was transported by the paramedics to Presbyterian-University Hospital, he had no pulse and was subsequently declared dead by the physicians who initially treated him at the hospital. No weapon was found on Rollins by the paramedics or the emergency room personnel who attempted to treat Rollins.

In processing the Escalade, two bullet fragments were found, one in the driver's door and the other one in the driver's footwell. It was determined that the bullet fragments were the same caliber and although they had similar markings, the criminalist who examined these fragments was unable to determine if they had been fired from the same weapon because one of the fragments was so small.

Brown and Scheuermann were interviewed that evening and told the Allegheny County Police that Booker was the shooter. The police prepared photo arrays for both Brown and Scheuermann and both of these individuals identified Booker as the individual who shot Rollins. An arrest warrant was issued for Booker and several weeks later, he was arrested in Williamsport, Pennsylvania.

In his direct appeal to the Superior Court, Booker raised claims that this Court erred in failing to charge the jury on the defense of justification and the lesser included offense of manslaughter. The Superior Court, in reviewing these claims, determined that they were waived since no specific objection was made by Booker's trial counsel after this Court announced that it would not charge on justification or manslaughter. Booker has now raised those claims on the basis that his trial counsel was ineffective for failing to assert a timely objection to this Court's refusal to charge on justification and

5

manslaughter. The claims of the ineffectiveness of his trial counsel provide Booker with a separate avenue for seeking to address those issues since the Supreme Court in *Commonwealth v. Collins, 585 Pa. 45, 888 A.2d 564, 573 (2005)*, recognized that the claim of the ineffectiveness of counsel is a separate claim from the underlying assertion that the Court erred in refusing to charge on specific issues.

> What is clear from *Immelmann* and *Molina* is that ineffectiveness claims are distinct' from those claims that are raised on direct appeal. The former claims challenge the adequacy of representation rather than the conviction of the defendant. Accordingly, we are persuaded by Appellant's position that a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under § 9544(a)(2). Ultimately, the claim may fail on the arguable merit or prejudice prong for the reasons discussed on direct appeal, but a Sixth Amendment claim raises a distinct issue for purposes of the PCRA and must be treated as such. *Cf. Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 462 (2004) (noting alternatively that even if the ineffectiveness claim was not previously litigated, the severance theory underlying the claim of ineffectiveness fails for the same reason the *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) theory failed on direct appeal). [FN10] For these reasons, we believe that a PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard announced in *Pierce*.[FN11] Consistent with this standard, the petitioner must establish that: (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of that counsel's deficient performance. *Pierce*, 527 A.2d at 976-77.

> > FN10. Furthermore, although in many cases the claim will be dismissed for the reasons discussed on direct appeal, this is not a distinction without a difference, because it is a distinct, constitutional claim that deserves its own analysis regardless of the result of that analysis. Furthermore, we can envision circumstances where a defendant may be entitled to relief on an

6

ineffectiveness claim attacking counsel's performance on direct review.

> FN11. Of course, an exception to this, which should rarely occur following our decision in *Grant, supra* n. 9, would occur if a claim of ineffectiveness was raised on direct appeal and a claimant seeks to raise the same claim of ineffectiveness on collateral review.

The Pennsylvania Supreme Court in *Commonwealth v. Collins, supra.,* recognized that there is a separate and distinct claim that is being asserted when the claim of the ineffectiveness is being made even as it pertains to an issue that has been previously litigated since the claim that is being raised is the stewardship of the petitioner's counsel which affects his rights under the Sixth Amendment and the United States Constitution, under Article I, Section 9 of the Pennsylvania Constitution. Although the basis for the claims of the ineffectiveness of Booker's counsel had been previously litigated in his direct appeal, it is the current contention of the ineffectiveness of his counsel with respect to those claims that provides Booker with the basis for asserting his current claims for relief under the Post-Conviction Relief Act.

In reviewing a claim of ineffectiveness it is well settled that the law presumes that counsel was effective and that the petitioner asserting that claim of ineffectiveness bears the burden of proving it. *Commonwealth v. Khalil, 806 A.2d 415 (Pa. Super. 2002).* In *Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),* the United States Supreme Court set forth the standards for the performance and prejudice for

7

evaluating the conduct of counsel. These standards were adopted by the Pennsylvania Supreme Court in *Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987)*, and require that a defendant prove a three-prong test, the first being that the claim currently being asserted has arguable merit; second, that counsel had no reasonable basis for his action or omission; and, third, that the defendant was prejudiced by his counsel's conduct. In *Commonwealth v. Kimball, 555 Pa. 299, 724 A.2d 326, 333 (1999)*, the Supreme Court set forth the burden of proof imposed upon a petitioner in establishing the claim of ineffectiveness.

> To show ineffective assistance of counsel which so undermined truth-determining process that no reliable adjudication of guilt or innocence could have taken place, postconviction petitioner must show: (1) that claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is reasonable probability that outcome of proceeding would have been different.

It is axiomatic that counsel's assistance is presumed to be effective and the petitioner has the burden of demonstrating otherwise. *Commonwealth v. Wright, 599 Pa. 270, 961 A.2d 119 (2008).* In demonstrating counsel's ineffectiveness the petitioner must prove that his underlying claim is of arguable merit, that his counsel's performance lacked a reasonable basis and that counsel's action or inaction caused him prejudice. *Commonwealth v. Gwynn, 596 Pa. 398, 943 A.2d 940 (2008).* In order to demonstrate prejudice, Booker must how that there is a reasonable probability but for counsel's error, the outcome in his case would have been different.

8

*Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203 (2001).* When it is clear that a party asserting the ineffectiveness of his counsel has failed to meet the prejudice prong of the ineffectiveness test, the claim may be dismissed on that basis alone without ever making a determination as to whether the other two prongs of the test had been met. *Commonwealth v. Rainey, 593 Pa. 67, 928 A.2d 215 (2007).* Failure to meet any prong of the test, however, would defeat an ineffectiveness claim since counsel is not ineffective for failing to raise meritless claims. *Commonwealth v. Peterkin, 538 Pa. 455, 649 A.2d 121 (1994).*

With respect to the two claims of error regarding the ineffectiveness of Booker's trial counsel for failure to object to this Court's refusal to charge the jury on the defense of justification and on the lesser-included offense of manslaughter, the Court's rationale on why those underlying claims had no merit was previously set forth in its original Opinion and that rationale has not changed.

> In his first claim of error, Booker maintains that when this Court refused to charge the jury on justifiable self-defense, it deprived him of a fair trial. In *Commonwealth v. Antidormi, 84 A.3d 736, 754 (Pa. Super. 2014),* the Court set forth the standard in reviewing a claim that the charge given to a jury was in error.

> > [W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of

9

discretion or an inaccurate statement of the law is there reversible error.

Booker's claim of error is not with respect to the charge that was given to the jury but the failure to give a specific charge on justifiable self-defense. In *Commonwealth v. Hairston,  Pa.  , 84 A.3d 657, 668 (2014),* the Court set forth the principle that would apply in examining a jury instruction.

> Defendants are generally entitled to instructions that they have requested and that are supported by the evidence. *Commonwealth v. Markman,* 591 Pa. 249, 916 A.2d 586, 607 (2007); *Commonwealth v. DeMarco,* 570 Pa. 263, 809 A.2d 256, 261 (2002) ("Where a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record."); *Commonwealth v. Browdie,* 543 Pa. 337, 671 A.2d 668, 673–74 (1996) ("[W]e hold that a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict."). We have explained that the reason for this rule is that "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *Commonwealth v. Taylor,* 583 Pa. 170, 876 A.2d 916, 925–26 (2005) (quoting *Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399, 400 (1980)). A criminal defendant must, therefore, "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial." *Id.* (citing *Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328, 1332–33 (1983)).

At the time of trial, the Commonwealth and Booker presented a total of fourteen witnesses who established that Rollins was the driver of the Escalade, Scheuermann was the front seat passenger, Brown was the right rear passenger and Booker was the left rear passenger seated directly behind Rollins. In between Brown and Booker was Rollins' and Scheuermann's one year old son who was in a car seat. Not one of these witnesses testified that Rollins had a gun and the only testimony with respect to anybody in the car other than Booker having a gun, was that Scheuermann had a gun a week after the shooting when she believed she was being stalked by Booker and pulled a gun from her purse. The investigating officers from Penn Hills Police Department

10

and the Allegheny County Homicide Detectives believed that they may have patted down Scheuermann and Brown but could not be certain of that fact.

In order to sustain a claim for justifiable self-defense, the evidence must establish three elements. First, that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary then and there to use deadly force against the victim to prevent such harm to himself. Second, that the defendant was free from fault in provoking the difficulty which ultimately resulted in the killing of another individual and, third, that the defendant did not violate a duty to retreat. *Commonwealth v. Samuel, 527 Pa. 298, 590 A.2d 1245 (1991).* The defense of justifiable self-defense has been codified in the Crimes Code, Section 505, which provides as follows:

### § 505. Use of force in self-protection

**(a) Use of force justifiable for protection of the person.--** The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.--**

(1) The use of force is not justifiable under this section:

(i) to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful; or

(ii) to resist force used by the occupier or possessor of property or by another person on his behalf, where the actor knows that the person using the force is doing so under a claim of right to protect the property, except that this limitation shall not apply if:

(A) the actor is a public officer acting in the performance of his duties or a person lawfully assisting him therein or a person making or assisting in a lawful arrest;

(B) the actor has been unlawfully dispossessed of the property and is making a reentry or recaption justified by section 507 of

11

this title (relating to use of force for the protection of property); or

(C) the actor believes that such force is necessary to protect himself against death or serious bodily injury.

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

(2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2) The presumption set forth in paragraph (2.1) does not apply if:

(i) the person against whom the force is used has the right to be in or is a lawful resident of the dwelling, residence or vehicle,

12

such as an owner or lessee;

(ii) the person sought to be removed is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the protective force is used;

(iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or

(iv) the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

(2.3) An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:

(i) the actor has a right to be in the place where he was attacked;

(ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and

(iii) the person against whom the force is used displays or otherwise uses:

(A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or

(B) any other weapon readily or apparently capable of lethal use.

(2.4) The exception to the duty to retreat set forth under paragraph (2.3) does not apply if the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

(2.5) Unless one of the exceptions under paragraph (2.2) applies,

a person who unlawfully and by force enters or attempts to enter an actor's dwelling, residence or occupied vehicle or removes or attempts to remove another against that other's will from the actor's dwelling, residence or occupied vehicle is presumed to be doing so with the intent to commit:

(i) an act resulting in death or serious bodily injury; or

(ii) kidnapping or sexual intercourse by force or threat.

(2.6) A public officer justified in using force in the performance of his duties or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape is not obliged to desist from efforts to perform such duty, effect such arrest or prevent such escape because of resistance or threatened resistance by or on behalf of the person against whom such action is directed.

(3) Except as otherwise required by this subsection, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do or abstaining from any lawful action.

**(c) Use of confinement as protective force.—**The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can, unless the person confined has been arrested on a charge of crime.

**(d) Definition.--**As used in this section, the term "criminal activity" means conduct which is a misdemeanor or felony, is not justifiable under this chapter and is related to the confrontation between an actor and the person against whom force is used.

Booker did not testify and, accordingly, his state of mind would have to be established by circumstantial evidence. Initially Booker maintains that the evidence presented by the Commonwealth would establish that two guns were in that vehicle since there were two bullet fragments that were found in the vehicle, one in the driver's door and one in the driver's footwell. Booker maintains that the Commonwealth's expert, Deborah Tator, who examined the bullet

14

fragments testified that they came from two different guns. A review of her testimony clearly indicates that she never offered an opinion that these bullets were fired from two different weapons. She testified that she examined both bullet fragments and was able to make the determination that they were of the same caliber and also suggested that they came from two different manufacturers; however, they had markings on both of them, which were consistent with each other. When asked whether or not these bullets were fired from the same gun, she could not offer an opinion on that because the second bullet was such a small sample. The location of the bullet fragments also militates against two guns since they were both found in the driver's area. Dr. Shakir, who performed the autopsy, indicated that Rollins had been shot three times from behind since the entry wounds were in his back and the exit wounds were in his chest.

As previously noted, the only testimony, which would establish that somebody else had another gun, was that Scheuermann possessed a firearm a week after the shooting, for which she had a valid license. If she in fact had a firearm, it is inexplicable why Rollins would have been shoot since he did not possess that firearm and there was no testimony that Booker shot at either Scheuermann or Brown.

Booker has suggested that Rollins must have had a firearm since a month prior to this homicide, the back window of his Escalade was shot out. In an attempt to explain why no one saw him with a gun, Booker has suggested that Scheuermann must have taken the gun off of him along with his personal belongings, since he did not have any when he was examined by the paramedics and she hid them in an effort to hide what really took place in the Cadillac Escalade. The proposed defense of justifiable self-defense was premised not upon facts of record but, rather, was supposition and the inferences to be drawn from those suppositions.

In *Commonwealth v. Mouzon, 617 Pa. 527, 53 A.3d 738, 740-741 (2012),* the Court was presented with a similar situation when the Trial Court rejected Mouzon's claim of self-defense because he had not established the basis for that defense. Like Booker, Mouzon did not testify and, accordingly, the evidence that would be the predicate for justifiable defense, would have been primarily based upon the Commonwealth's evidence and the circumstantial evidence drawn therefrom.

By way of background, a claim of self-defense (or justification, to use the term employed in the Crimes Code) requires evidence establishing three elements: "(a) [that the

15

defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." *Commonwealth v. Samuel,* 527 Pa. 298, 590 A.2d 1245, 1247–48 (1991). *See also Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 449 (1997); 18 Pa.C.S. § 505.[FN2] Although the defendant has no burden to prove self-defense, *see* discussion below, before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." *Commonwealth v. Black,* 474 Pa. 47, 376 A.2d 627, 630 (1977). The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." *Commonwealth v. Burns,* 490 Pa. 352, 416 A.2d 506, 507 (1980).

There was no evidence presented as to the defendant's state of mind or what an individual's state of mind would have been had they been in the position that Booker found himself. There was no evidence to conclude that anyone in the Cadillac Escalade, other than Booker, had a weapon. There was no evidence of a fight or altercation between Booker and Rollins nor was there any evidence which one could reasonably infer that it was then and there necessary for Booker to use deadly force to repel an attack being perpetrated against him by his victim. In light of Booker's failure to point to evidence from which one could reasonably conclude that he was in fear of serious bodily injury or death, the claim of justifiable defense was rejected and this Court properly refused to charge on that purported defense.

Booker next maintains that this Court erred when it failed to charge on a lesser-included offense of voluntary manslaughter. Voluntary manslaughter[1] is defined in the Pennsylvania Crimes Code as follows:

### § 2503. Voluntary manslaughter

_____

[1] 18 Pa.C.S.A. §2503(a) and (b).

16

**(a) General rule.**--A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.**--A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

When reviewing the record in the instant case, it is clear that there was no basis upon which the charge of voluntary manslaughter should have been submitted to the jury. As previously noted, Booker's actions were not as a result of justifiable self-defense but, rather, an intentional killing occurred during the commission of an attempted robbery. There is nothing in the record, which would establish that Booker was acting under a sudden and intense passion resulting from serious provocation or that negligence or an accident caused the death of Rollins. In *Commonwealth v. Scott, 73 A.3d 599, 602 (Pa. Super. 2013),* the Court noted that a Court is not required to give every instruction requested but, rather, should only instruct the jury on the issues that have been joined between the Commonwealth and the defense.

In reviewing a jury charge, we are to determine "whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Brown,* 911 A.2d 576, 582–83 (Pa.Super.2006). In so doing, we must view the charge as a whole, recognizing that the trial court is free to use its own form of expression in creating the charge. *Commonwealth v. Hamilton,* 766 A.2d 874, 878 (Pa.Super.2001). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Id.* It is well-settled that "the trial court has wide discretion in

17

fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Brown,* 911 A.2d at 583.



The issue of voluntary manslaughter never arose since there was insufficient factual basis to establish that Booker killed Rollins in a heated passion or did so with the unjustifiable belief of a right of self-defense. This Court charged the jury based upon the facts of record and limited those issues for its consideration to first-degree murder, second-degree murder and third-degree murder. As with Booker's first claim of error, this current contention had no merit.

Since the underlying claims had no merit, Booker's trial counsel could not have been ineffective for failing to object to this Court's refusal to charge on his claims.

Booker's next claim of error is that his trial counsel was ineffective for failing to counsel him properly on his right to testify. The fallacy of this claim of error is demonstrated by the colloquy that this Court undertook with Booker with respect to his right to remain silent or to testify, which is contained in pages two hundred twenty-six through two hundred thirty-two of the trial transcript. In that colloquy this Court advised Booker of the charges that had been filed against him and the maximum penalties that could be imposed upon him should he be convicted of those charges. The Court also advised him that under the Constitutions of the United States and the Commonwealth of Pennsylvania, he had an absolute right to remain silent. Booker was also advised that if he exercised his right to remain silent,

18

and should he request the appropriate jury instruction, the jury would be instructed that they could not infer guilt from his decision not to testify nor could they draw any inference adverse to him as a result of his decision not to testify. This Court further advised Booker that he had an absolute right to testify and if he would testify then he would have been subjected to a cross-examination as to any and all matters that might touch upon his direct testimony. Booker was also advised of his right to present character testimony and if he presented such testimony, the Commonwealth had the right to attempt to impeach that testimony by his convictions of other crimes. Booker was asked whether or not he had sufficient time to discuss the question of whether or not he should he testify with his counsel and he said that he did and also understood that his counsel could not make this decision for him and that his decision not to testify was a free and voluntary decision. Booker acknowledged that he had no drugs or alcohol within forty-eight hours prior to making this decision nor did he suffer from any mental illness which would have prevented him from making that decision.

It is abundantly clear that Booker understood his right to testify and his right to remain silent. It is also clear that if in fact his counsel suggested that he not testify, there was a legitimate reason for him not to testify since his testimony could have been impeached by his 2000 convictions for burglary, theft by unlawful taking and theft by deception. In addition, he had a conviction for the unauthorized use of a motor vehicle in 2010 and in

19

2011 he had a conviction for criminal attempt to commit criminal trespass. Booker knew of these convictions and his counsel was also well aware of them and it would have been a reasonable strategy to suggest that he not testify since these convictions would be used to impeach any evidence that he might have attempted to educe with respect to his state of mind and belief that he had the defense of justification and also, whether or not he acted in the heat of passion or an unjustifiable belief of the right of self defense which would have entitled him to the charge of manslaughter. It is abundantly clear that Booker was well aware of his right to testify and he, and he alone, made the decision not to testify.

Booker's final contention of error is that his trial counsel was ineffective for failing to present the testimony of Dr. Alice Applegate as a witness in support of his claim of a defense of justification. In *Commonwealth v. Rivera, 631 Pa. 67, 108 A.3d 779, 791-792 (2014),* the Supreme Court set forth the elements necessary to establish the reasonable belief that deadly force is needed to protect oneself from death or serious bodily injury as follows:

> Germane to whether the defendant reasonably believed it was necessary to kill to protect from imminent death or great bodily harm, our case law has recognized two requisite components to a defendant's state of mind: (1) the defendant's subjective belief that he had an honest, bona fide belief that he was in imminent danger, to which expert testimony is admissible; and (2) the objective measurement of that belief, *i.e.*, the reasonableness of that particular belief in light of the facts as they appear, to which expert testimony is inadmissible. Sepulveda, 55 A.3d at 1125–26; *Commonwealth v. Sheppard,* 436 Pa.Super. 584, 648 A.2d 563, 568 (1994).

> Assuming, for purposes of discussion, that there is arguable merit to Appellant's

20

claim, we conclude that he has failed to satisfy the remaining prongs of the ineffectiveness test. First, we decline to hold that it was unreasonable for trial counsel to present Appellant's testimony in support of a self-defense claim in the absence of corroborative expert testimony. As noted cogently by the Commonwealth, it is not beyond the purview of a layperson to comprehend that Appellant may have reasonably believed that his life was in danger when he was being chased by an unidentified man in the middle of the night after an altercation in a parking lot. *See* N.T., Aug. 7, 2008, at 694 (where trial counsel sets forth the defense theory in closing argument that "you have a situation of [Appellant] being chased by a man he doesn't know, seconds after a fight and gunshots are fired"). *See also e.g., Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 781 (1998) (holding that there was no need for expert testimony to demonstrate that a victim would experience fear and terror when he is being brutalized and suffocated).

We understand Appellant's argument that it would have furthered trial counsel's strategy of presenting him as a credible witness if counsel had portrayed him as an individual suffering from mental illness who, due to his PTSD, subjectively viewed Officer Wertz's unarmed pursuit as a threat requiring the use of deadly force. It cannot be ignored, however, that Dr. Blumberg's diagnosis of PTSD did not exist at the time of trial, and was not rendered until 2011, five years after the murder. Significantly, as detailed *infra* at 804–06 (discussing Appellant's claim of ineffectiveness for failing to present mental health mitigation evidence during the penalty phase of trial), Appellant, in fact, had been evaluated by a defense mental health expert prior to trial who did not opine that Appellant suffered from PTSD or any disorder affecting the subjective reasonableness of his belief that deadly force was required.[8] Accordingly, Appellant's real contention is that he is now dissatisfied with the conclusions of the defense mental health expert that his counsel retained for trial. As espoused *infra* at 809–10, trial counsel was effective in retaining a mental health expert prior to trial and preparing him to testify on Appellant's behalf, and was not required to seek out a second mental health expert to provide a different opinion more favorable to his client. Moreover, to the extent that Appellant contends trial counsel was ineffective for failing to provide his own mental health expert with the requisite information to enable him to conclude that Appellant suffered from PTSD, this claim is belied by the record, as demonstrated in our discussion of his related penalty phase claim. *Id.*

Additionally, the PCRA court's conclusion that no prejudice resulted from trial counsel's failure to present expert testimony is supported by the record and is free from legal error. Even assuming the reasonableness of Appellant's belief that he was in imminent danger, this Court held on direct appeal that Appellant failed to satisfy the remaining requisites for justification because he acknowledged that he could have retreated safely, instead of employing deadly force, and was the initial aggressor in the encounter by firing his weapon in a crowded parking lot. *See Commonwealth v. Busanet,* 618 Pa. 1, 54 A.3d 35, 55 (2012) (rejecting the claim that trial counsel was ineffective for failing to present mental health evidence to lessen his culpability from first degree murder to voluntary manslaughter under

> the theory of imperfect self-defense because it had already been established that Appellant initiated the encounter and acknowledged that he could have avoided the whole incident by retreating safely).[9]

There is no need to present expert testimony if a reasonable person believed that his or her life was in danger or believed that the situation they were in made it necessary to use deadly force to protect himself or herself. The problem with this particular contention, however, is that there is no basis for suggesting that he had a reasonable belief. Booker did not testify, his state of mind was never placed at issue, the facts of the case were such that he was the aggressor, he was the one that had the weapon and he was the one that was attempting to commit a robbery since he placed a gun at the victim's head initially and demanded the victim's money. What Booker was attempting to do was establish the facts through a proposed expert since he decided not to testify. It should also be noted that Dr. Applegate did not testify during the trial, she testified at sentencing and not once through her testimony did she ever make reference to an unjustifiable belief that Booker had in the commission of these crimes. Rather, she attempted to present mitigating testimony with respect to his sentencing. She described him as mentally retarded since her psychological tests revealed that he had an IQ of fifty-five, that he was anti-social, and that he felt like he was being victimized by other people. She also indicated that he would have a difficult time in certain situations in establishing right from wrong.

22

It is abundantly clear that this claim of error is not predicated upon a claim of ineffectiveness but, rather, on Booker's desire to have that expert testimony substituted for his own on his state of mind when he knew that his testimony would be filled with challenges as a result of his numerous prior convictions.

BY THE COURT:

_____ A.J.

DATED:      February 21, 2017

23