376 A.2d 627

**COMMONWEALTH of Pennsylvania**

v.

**John A. BLACK, Appellant.**

Supreme Court of Pennsylvania.

Argued April 2, 1976.

Decided Aug. 17, 1977.

48

Joel Harvey Slomsky, Philadelphia, for appellant.

50

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Deborah E. Glass, Asst. Dist. Atty., for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

This appeal arises out of the shooting death of one Paul Williford on January 10, 1974. Appellant John Black was arrested immediately thereafter and charged with murder. Following a trial before a jury in the Court of Common Pleas, Philadelphia County, Black was convicted of murder of the second degree. Post-trial motions were argued and denied and appellant was sentenced to a period of imprisonment of not less than five nor more than twenty years in the state correctional institution at Graterford. This direct appeal followed.[1]

At time of trial, appellant did not deny that he shot the decedent but asserted self-defense. It is now argued that the trial court erred in refusing to permit the jury to hear the testimony of two defense witnesses, a psychiatrist and a psychologist, who would have testified concerning the state of mind of appellant at the time of the incident in order to support the claim of self-defense. Although we agree that the proffered evidence would have been relevant to a claim of self-defense, *Commonwealth v. Light*, 458 Pa. 328, 326 A.2d 288 (1974), the exclusion of that evidence in this case was not reversible error. Rather, we conclude that even had the evidence been admitted, the record failed to establish as a matter of law a valid claim of self-defense.

The testimony adduced by the Commonwealth was as follows. On the evening of January 10, 1974, appellant was at his home on Juniata Street in Philadelphia with his

1. Jurisdiction in this Court is pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1976–77).

common law wife, Ruth Black. Mrs. Black was the mother of Lillian Williford, the wife of the decedent, who resided on North 21st Street in Philadelphia. Mrs. Williford telephoned her mother that evening at approximately 7:00 P.M., and after they had briefly conversed, appellant informed his wife that he wished to speak to Mrs. Williford. Appellant took the telephone and asked to speak to the decedent. Mrs. Williford went upstairs to listen to the conversation on an extension telephone, and the decedent's 14-year-old son also listened in on a basement extension. They both testified that appellant sounded "drunk." They heard appellant curse at decedent and tell him, "If you come down here, I'll kill you on the spot. I'll shoot you. I'll be waiting for you." They further testified that the decedent said, "Now John," then hung up the telephone, put on his coat and left the house. Following his departure at approximately 7:30 P.M., Mrs. Williford telephoned the police.

When the police officers arrived at the address of appellant they found the deceased lying on the sidewalk near the curbline, a few feet from his car. The body was between appellant's property at 1851 Juniata Street and the adjoining neighbor's residence at 1853. Appellant was sitting on the top step of his front porch holding a gun in his hand. The officer asked what happened and appellant replied, "I shot him." After handing over his weapon, a .22 calibre revolver, to the officer, appellant was arrested and taken to the Police Administration Building for questioning. The Commonwealth's medical examiner testified that the decedent died from a single .22 calibre bullet which entered his chest from the front.

Appellant's account of the incident stands in sharp contrast to that presented by the Commonwealth. Appellant testified that the decedent had argued with him one month before the shooting concerning statements made by appellant to a woman whom the decedent was seeing. Appellant testified that Mr. Williford was enraged because he (Black) had told the lady that Williford was married. It was further testified that the decedent initiated the same argu-

ment over the telephone on the evening of the shooting. The decedent threatened appellant, and, despite appellant's entreaties, stated that he was "coming down to settle it on the street." After hanging up, Black stated that he was "mixed up and excited." He feared a confrontation, and instructed his wife to bring their dog around to the front of the house. He then stood in the open front doorway to await Williford's arrival. Within minutes, the decedent pulled up in front of the house, jumped out of his car and ran toward appellant while reaching into his pocket.[2] The decedent's actions allegedly frightened appellant, and in response, Black grabbed a gun which the family kept on the top of the radio near the front door, pointed it in decedent's direction and "just hauled off and shot him." After firing one shot, which proved fatal, appellant sat down on the porch to await the arrival of the authorities. Williford, upon being struck by the bullet, collapsed on the sidewalk near the curb.

The statutory definition of self-defense is set forth in the New Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1, et seq., 18 Pa.C.S. § 501 et seq. Section 505(a) specifically provides:

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such person on the present occasion."

█ The operation of the defense of self-defense is limited however, by Section 505(b)(2) which proscribes the use of deadly force except under those circumstances where "the actor believes that such force is necessary to protect himself against death [or] serious bodily injury . . ." Moreover the word "believes" as used in both above-quoted subsections is defined to mean "reasonably believes" pursuant to Section 501. See also, Commonwealth v. Walley, 466 Pa. 363, 353 A.2d 396 (1976); Commonwealth v. Cropper, 463 Pa. 529, 345

---

2. The Commonwealth's medical examiner testified that an unopened silver pocketknife was found in decedent's pocket.

A.2d 645 (1975); *Commonwealth v. Bamber*, 463 Pa. 216, 344 A.2d 799 (1975). Thus, as provided by statute and as interpreted through our case law,[3] to establish the defense of self-defense it must be shown that a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have *reasonably* believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom; and c) the slayer did not violate any duty to retreat or to avoid the danger. *Commonwealth v. Myrick*, 468 Pa. 155, 360 A.2d 598 (1976); *Commonwealth v. Cropper, supra.*

While there is no burden on the defendant to prove a claim of self-defense, it is nevertheless required that before such a defense is properly in issue at trial, there must be some evidence, from whatever source, to justify such a finding. Once the question is properly before the jury, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not in fact acting in self-defense. *Commonwealth v. Walley, supra; Commonwealth v. Cropper, supra.*

Our review of the instant record convinces us that all requisite elements of self-defense have not been presented. Specifically, the evidence fails to provide a basis for a finding that appellant entertained a reasonable belief that he was required to use force dangerous to life in order to protect himself.[4] Restated, accepting all the evidence in a posture most favorable to appellant, there is no reasonable basis from which to conclude that deadly force was warranted at the instant the fatal shot was fired.

**3.** For the most part, the Code merely codified the prior law of this Commonwealth. *See Commonwealth v. Cropper*, 463 Pa. 529, 345 A.2d 645 (1975). *Accord, Commonwealth v. McComb*, 462 Pa. 504, 341 A.2d 496 (1975); *Commonwealth v. Lowe*, 460 Pa. 357, 333 A.2d 765 (1975); *Commonwealth v. Mahoney*, 460 Pa. 201, 331 A.2d 488 (1975).

**4.** In view of our holding we need not consider whether there was testimony supportive of the other elements of self-defense.

54

Appellant concedes that upon arrival decedent did no more than park his vehicle in front of the premises and alight therefrom with a hand in his pocket and a "mean look" on his face. The victim had not uttered any remarks nor brandished a weapon. Moreover, it is uncontradicted that at the moment the weapon was discharged the victim had not reached a position in relationship to where appellant was standing to have posed an immediate threat to Black. Rather the body was found lying between appellant's property and the next adjoining house.[5] Equally significant is the absence of any evidence to indicate to Black that Williford was aware of his presence in the doorway. .

Appellant admits that he brought his watchdog to the front porch while awaiting decedent; his gun was within reach just inside the doorway. Upon seeing decedent, Black seized the gun and fired. In so doing he ignored reasonable alternatives available to him, e. g., ordering the victim to halt, warning him that he (Black) possessed a weapon or attempting to ascertain Williford's intended action. Any of these options could have safely been pursued without increasing the risk of harm to Black. Under these circumstances, we find that the use of deadly force was unwarranted. Accordingly, we find as a matter of law that the defense of self-defense was not properly before the jury, and therefore the failure to permit the proffered psychiatric evidence is not a basis that would justify the reversal of the judgment of sentence.[6]

5. The record fails to disclose the exact measurement of the distance between the place where appellant was standing when he fired the shot and where the victim was when struck by the projectile.

6. Our resolution of this question also disposes of the argument that as a matter of law the evidence presented in support of this claim of self-defense required that the judgment of sentence be arrested and appellant discharged. However, we note that even if there had been testimony which may have supported a finding of self-defense, if believed, the resolution of the disparate versions of the events surrounding the killing would have been a question of credibility for the jury. *Commonwealth v. Lowe, supra; Commonwealth v. Zapata*, 447 Pa. 322, 290 A.2d 114 (1972).

■ It is next argued that the trial court erred in allowing the wife and son of decedent to testify concerning a conversation between appellant and Williford which the witnesses overheard while listening in on extension telephones. The basis of this contention is that the evidence was obtained as a result of an invasion of appellant's privacy and therefore inadmissible under statute. *See* Act of Dec. 27, 1974, P.L. 1007, No. 327, § 3, as amended, 18 Pa.C.S. § 5703 (Supp.1976–77). However, we need not consider this claim since the record indicates that at time of trial, defense counsel did not raise this objection to either witness testifying as to the conversation in question.[7] Accordingly, the issue has not been properly preserved for appellate review. *Commonwealth v. Williams*, 458 Pa. 319, 326 A.2d 300 (1974); *Commonwealth v. Kuterbach*, 458 Pa. 318, 326 A.2d 283 (1974); *Commonwealth v. Little*, 449 Pa. 28, 295 A.2d 287 (1972).

Appellant also suggests that the trial court erred in striking a juror from the sworn petit jury on the grounds that she was the sister of a defense witness. The record establishes that following the presentation of the Commonwealth's evidence, the defense called its first witness, one Della Morris. Ms. Morris worked at the bar where appellant had allegedly been drinking prior to the incident. The witness was to testify that she served appellant drinks until he became inebriated. When the witness was called to the

7. On direct examination Lillian Williford, wife of the deceased testified that she had called her mother (appellant's wife) on the telephone to speak with her. During the conversation appellant took the phone and spoke briefly with the witness. When asked to relate the conversation between herself and appellant defense counsel raised a general objection, which the court overruled. Following her response the witness was then asked what conversation she subsequently overheard between appellant and decedent. No objection was raised to the witness answering that question for the jury. Nor was an objection raised when the same question was asked of decedent's son, Paul Williford, who also overheard the conversation.
    The posture of the record at the time the objection was interposed satisfies us that the court's attention was not being directed to the alleged improper interception of the conversation which is now being relied upon. That claim was first articulated during post-trial motions.

stand, one of the jurors informed the court that Ms. Morris was her sister. A conference ensued out of the hearing of the jury during which the juror was questioned by the court and counsel. Over the objection of the defense the juror was then dismissed. It is now contended that this constituted an abuse of discretion and deprived appellant of his right to a trial by a jury of his own selection. We disagree.

The discharge of a juror is within the sound discretion of the court and that determination will not be reversed absent a palpable abuse of that discretion. *Commonwealth v. Jennings*, 446 Pa. 294, 285 A.2d 143 (1971); *Commonwealth v. Pasco*, 322 Pa. 439, 2 A.2d 736 (1938); *Commonwealth v. Bentley*, 287 Pa. 539, 135 A. 310 (1926). We have recognized that this discretion exists even after the jury has been impanelled and the juror sworn. *Commonwealth v. Saxton*, 466 Pa. 438, 353 A.2d 434 (1976).[8]

In the instant case, the trial judge dismissed the juror as a precautionary measure to insure an impartial trial, free of outside influences, and to avoid the appearance of impropriety. While we recognize the relationship of the juror to the witness does not, as a matter of law disqualify that juror, *see e. g., Commonwealth ex rel. Fletcher v. Cavell*, 395 Pa. 134, 149 A.2d 434 (1959), we do not believe that a judge who, out of an abundance of caution excludes such a juror, abuses his discretion by doing so. The nature of the relationship might tend, even unconsciously, to cause the juror to assess the testimony of a related witness less objectively than another witness who was previously unknown to her. Additionally, the fact of the relationship quite possibly could influence the other jurors in their assessment of the related witness' testimony. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). *See also, Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 45 L.Ed.2d 712 (1975); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). This obligation is applica-

8. In that case we found the trial court had abused its discretion.

ble whether we are considering the rights of the defendant or the interest of the state. While we recognize that these considerations are to some degree dependent upon speculation, the recognition of the possibility of prejudice or bias resulting from such a close relationship is certainly justified and the action of the court in removing this juror to assure fairness is obviously reasonable.[9] *Cf. Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Commonwealth v. Stewart,* 449 Pa. 50, 295 A.2d 303 (1972).

Appellant's final contention is that the trial court failed to give a timely instruction concerning the use of impeachment evidence. The pertinent facts establish that the last witness in the trial was called by the Commonwealth to impeach the credibility of appellant's wife by introducing her prior inconsistent statements made to the police at the time of the arrest. Defense counsel requested an instruction that the rebuttal testimony was to be considered only for impeachment purposes but not as direct substantive evidence. The court denied the request on the basis that the request was premature since he did not know what the evidence would establish. Following the testimony, defense counsel renewed his motion for cautionary instructions. When this was refused he moved for a mistrial which was also denied.

■■■ While it may ordinarily be preferable for the court to give immediate cautionary instructions concerning rebuttal testimony, we do not believe the failure to do so in the instant case constituted error. As previously noted, the rebuttal testimony was the final evidence presented in the case. The following morning, the trial court charged the jurors. At the conclusion of the charge he drew special attention to the testimony in question by stating:

"The Commonwealth presented rebuttal testimony. This testimony was offered to impeach the credibility of a defense witness. That was the last witness who appeared that read a statement given by the wife of the defendant.

9. It is to be noted that a defendant is not entitled to the services of any particular juror. *Commonwealth v. Fisher,* 447 Pa. 405, 290 A.2d 262 (1972).

The testimony was offered solely to impeach the credibility of the defense witness. You are not to consider the rebuttal evidence as direct evidence but you are to consider it only as impeaching evidence."

This part of the charge was adopted verbatim from the points submitted by defense counsel. It concisely and accurately explained to the jurors the limitations imposed on their consideration of the evidence in question. Moreover, appellant requested no further instruction and indicated he was satisfied with that portion of the charge. Under the circumstances herein presented, we find no prejudice to appellant.

Judgment of sentence affirmed.

JONES, former C. J., did not participate in the decision of this case.

ROBERTS and MANDERINO, JJ., filed dissenting opinions.

ROBERTS, Justice, dissenting.

The majority holds that appellant was properly denied the opportunity to present evidence that he believed the force he used was necessary to protect himself because there was no evidence that appellant's belief was reasonable. I cannot agree.

If appellant's belief was unreasonable he could be convicted of voluntary manslaughter,* but might still have a valid

---

* 18 Pa.C.S.A. § 2503 (1973) provides that a person who commits an intentional or knowing killing under an unreasonable belief that the killing was necessary to protect himself is guilty of voluntary manslaughter. Appellant did not request an instruction on voluntary manslaughter, but this does not constitute a waiver of a claim that the killing was committed without malice. Appellant's belief that he was acting in self-defense might serve to negate malice. Because this evidence might serve to negate an element of the crime, appellant was entitled to introduce evidence of his belief, even though the evidence might prove appellant guilty of another crime. If there is a concern that appellant might be found not guilty of murder where the evidence indicates that he was guilty of voluntary manslaughter, the Commonwealth should request an instruction on voluntary manslaughter. For example, we do not require a murder defendant to

defense to a murder charge, if the jury credited his story. Appellant's belief that force was necessary, even if unreasonable might convince the jury that the killing was committed without malice, thereby negating an element of the crime of murder.

Accordingly, I dissent.

MANDERINO, Justice, dissenting.

Appellant testified that he was "frightened" by the decedent's actions just prior to the shooting. In order to support his claim of self-defense, appellant attempted to place the testimony of two expert witnesses before the jury. These witnesses were Dr. Albert Leavitt, Chief Psychologist of the Philadelphia Court of Common Pleas, and Dr. Kenneth Kool, M. D., a professional psychiatrist. Both had examined appellant prior to trial, and both were prepared to testify concerning appellant's state of mind at the time of the shooting. According to the offer of proof placed on the record by appellant's trial counsel, Dr. Leavitt would have testified that appellant was pathological and suffered from organic deficiencies which had accrued over time due to his heavy alcohol intake and perhaps also to poor diet; Dr. Leavitt would have stated that appellant was paranoid and overly suspicious, but that he would not actively look for trouble or confrontation. If he were threatened, however, his paranoid condition would be heightened, and he would assume a defensive posture, seeking out "concrete" and "tangible" means of defending himself, as opposed to seeking assistance from a third party or the authorities. Dr. Kool would have corroborated Dr. Leavitt's diagnosis.

The purpose of the testimony of these two psychiatric experts was to aid the jury in making a determination of appellant's state of mind at the time of the shooting. The psychiatric testimony was designed to help the jury to

request an instruction on aggravated assault before he may introduce evidence that his action did not cause the death of the victim. So too here, we cannot require the defendant to request a voluntary manslaughter instruction before he may introduce evidence that he believed his action was necessary to protect his life.

understand appellant's perception of the events leading up to the shooting, and based on that understanding of appellant's subjective mental state, to determine whether or not *this appellant* acted reasonably under the circumstances.

"It is for the jury to decide whether the defendant's belief was reasonable. Such a determination must be based on the facts and circumstances *as the defendant perceived them.* This they were unable to do because psychiatric testimony concerning the defendant's state of mind and its effect on his perception of the facts and circumstances that immediately preceded the shooting was withheld from the jury." *Commonwealth v. Light,* 458 Pa. at 340–341, 326 A.2d at 295 (Dissenting Opinion of Manderino, J., joined by Roberts, J., and Nix, J.)

The issue presented in this case is not whether some unreal *perfect being* acted reasonably but whether a *human being* acted reasonably. The proper statement of the issue is necessary to its proper resolution. Sane *human beings* vary greatly in their *reasonable* reactions to situations with which they are confronted. The jury, therefore, should be entrusted with the decision as to a particular defendant. The justice of a particular situation cannot be ascertained as a matter of law.

As stated in *Commonwealth v. Light,* 458 Pa. 328, 340, 341, 326 A.2d 288, 295 (1974) (Dissenting Opinion of Manderino, J., joined by Roberts, J., and Nix, J.):

"It is easy to imagine situations where two different people could, because of differences in their subjective states of mind 'reasonably' react in totally different ways to the same stimulus. For example, one who, confronted on a sidewalk by a growling dog, reacts in terror because of a subjective fear of animals, is no less reasonable (based on the facts *as he perceives them*) in his belief that the dog is about to attack than another who, because of years of training as a veterinarian and experience in handling dogs, sees that (based on the facts *as he perceives them*) there is no danger. (Emphasis in original.)

The jury must therefore consider the circumstances *as perceived by the defendant* when determining the reasonableness of the defendant's belief that he was in imminent danger of death or serious bodily harm. Psychiatric evidence as to a defendant's state of mind immediately prior to the killing is relevant because it aids the jury's understanding of the defendant's perception of the circumstances preceding the slaying.

In *Murray v. Commonwealth*, 79 Pa. 311, 317 (1875), it was said,

"It is not necessary that a man shall be in actual imminent peril of life, or great bodily harm before he may slay his assailant. It is sufficient if in good faith he has a reasonable belief founded upon the facts as they appeared to him at the time, that he is in imminent peril, *even though it should afterwards appear that he was mistaken.*" (Emphasis added.)

The *jury* should decide the reasonableness of defendant's belief that he was in imminent danger of death or serious bodily harm. The majority, however, says that the exclusion of relevant evidence such as that offered here was not error because, even if the psychiatric testimony had been admitted, " . . . the record failed to establish as a matter of law a valid claim of self-defense." (Majority opinion at p. 50.) I dissent.

The majority's analysis implies that the defendant in a homicide case must "establish" a self-defense claim. Our recent cases clearly indicate that once the possibility of a defense of self-defense has entered the case (regardless of the source of that possibility), the prosecution must prove beyond a reasonable doubt that the accused was *not* acting in self-defense at the time of the slaying in order for the conviction to be sustained. *Commonwealth v. Walley*, 466 Pa. 363, 353 A.2d 396 (1976); *Commonwealth v. Cropper*, 463 Pa. 529, 345 A.2d 645 (1975). To negate the claim of self-defense the prosecution must show that *at least* one of the elements of that defense was absent. Therefore, it is necessary for the prosecution to establish either that the

defendant did not subjectively believe that he was in imminent peril of death or serious bodily harm, or if such belief was, in fact, held, the prosecution may negate the defense by proving beyond a reasonable doubt that that belief was unreasonable under the circumstances. Also, the prosecution could prevail by establishing that the slayer was not free from fault in provoking or continuing the incident which resulted in the slaying, or, the prosecution could meet its burden by showing beyond a reasonable doubt that the slayer had a duty to retreat or to avoid the danger and that he or she had the opportunity to do so but elected not to. *See Commonwealth v. Myrick*, 468 Pa. 155, 360 A.2d 598 (1976); *Commonwealth v. Cropper, supra*, 463 Pa. 529, 345 A.2d 645 (1975).

To state that ". . . the record failed to establish as a matter of law a valid claim of self-defense . . . " therefore misconceives the nature of the problem. The question which must be answered is whether the prosecution has established beyond a reasonable doubt that the defendant was not acting in self-defense at the time the homicide was committed. Evidence of the defendant's state of mind is relevant to the jury's determination of that issue and, as conceded by the majority, its exclusion is therefore error. Contrary to the assertion of the majority, however, the exclusion of the evidence at issue in the instant case cannot be considered harmless because we, as an appellate court, cannot say beyond a reasonable doubt that the jury would have arrived at the same result had they heard it. The proffered testimony was such that it could have created a reasonable doubt in the jury's collective mind as to whether the prosecution had established all the elements of the charge beyond a reasonable doubt. It could have, for example, created a reasonable doubt as to whether appellant acted with malice, for if he believed he was in imminent danger, he could not have acted maliciously. It could also have created a reasonable doubt as to the prosecution's claim that such a belief was unreasonable under the circumstances. Furthermore, it had relevance concerning the question

of provocation, and could have allowed the jury to acquit by creating a reasonable doubt as to whether appellant, as claimed by the prosecution, provoked the incident which resulted in the slaying.

For these reasons I would reverse the judgment of sentence and remand for a new trial.